## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DIVISION OF ARKANSAS
## HELENA DIVISION

| | | |
|---|---|---|
| IN RE: | **JAY GARDNER WRIGHT and** | **2:04-bk-12314E** |
| | **MARY RUSH WRIGHT** | **CHAPTER 7** |

**ST. FRANCIS COUNTY FARMERS ASSOCIATION**                    **PLAINTIFF**

**V.**                          **AP NO: 2:05-ap-1087**

**JERRY WRIGHT and AUDREY WRIGHT,**
**WRIGHT LAND COMPANY**                    **DEFENDANTS**

**and**

**ST. FRANCIS COUNTY FARMERS ASSOCIATION**                    **PLAINTIFF**

**V.**                          **AP NO: 2:04-ap-1289**

**JAY GARDNER WRIGHT**
**and MARY RUSH WRIGHT**                    **DEFENDANTS**

### <u>MEMORANDUM OPINION</u>

Now before the Court is the *Complaint* to set aside fraudulent transfers and the

*Complaint Objecting to Discharge* filed by Fletcher Long, Jr., on behalf of St. Francis

County Farmers Association (the "**Creditor**" or "**St. Francis County**").[1]   The

*Complaint* to set aside fraudulent transfers was filed against Jerry and Audrey Wright

(parents of Debtor Jay Wright) and Wright Land Company ("**Jerry Wright**," "**Jerry**

---

[1]This case was transferred to this Court per an Order of Recusal entered by
Judge Mixon on April 12, 2005.

1

**and Audrey Wright,**" or "**Wright Land Company**"), and the *Complaint Objecting to Discharge* was filed against Jay and Mary Wright (the "**Debtors,**" "**Jay Wright,**" or "**Double Wright Partnership**"). The above captioned adversary proceedings were consolidated for trial purposes by way of an Order entered July 11, 2005, and trial was held on the Complaints on December 20, 2005, and March 28, 2006. Appearing at the trial were: Mr. Long on behalf of the Creditor, Mr. Thomas on behalf of the Debtors, the Debtors, and Mr. Coleman on behalf of Jerry and Audrey Wright and Wright Land Company, and Jerry and Audrey Wright. At the conclusion of the trial, the Court took the Complaints under advisement.

The Court has reviewed the pleadings, testimony and evidence presented, and makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052 (made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014). This is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (J), and the Court has jurisdiction to enter a final judgment in this case. The Court finds that St. Francis County met its burden of proof under § 727(a)(3), and Jay and Mary Wright are, therefore, not entitled to a discharge. The Court also finds that St. Francis County, as an unsecured creditor, lacked standing to bring the *Complaint* to set aside fraudulent transfers under the Bankruptcy Code, and that because the remaining state law fraudulent transfer claims do not have any effect

on the administration of the bankruptcy estate, the Court does not have "related to" jurisdiction over the remaining state law fraudulent transfer claims. A review of the testimony received at trial and the Court's findings of fact and conclusions of law follows.

## I. TESTIMONY

### A. Introduction

For the past ten years, the Debtors, Jay and Mary Wright, have been engaged in a farming operation under the name of Double Wright Partnership. Jerry and Audrey Wright are Jay Wright's parents and are the only stockholders and the only directors and officers of Wright Land Company, an Arkansas corporation. Wright Land Company owns a significant amount of farm land and in past years was also engaged in a farming operation. Wright Land Company leased its land to other people, including the Debtors. Both Jerry Wright and Wright Land Company and Jay Wright and Double Wright Partnership purchased farming supplies and had accounts with St. Francis County, an agricultural cooperative. Jerry Wright was a member of the Board of Directors at St. Francis County for more than twenty-five years. Jay Wright was currently engaged in farming, and borrowed money from St. Francis. Jay Wright and Double Wright Partnership's account with St. Francis County was delinquent at the end of the 2001 farming year. Because of the delinquency, St.

Francis County filed suit in state court.

Jay was unable to get financing for the 2002 farm year, so Jerry agreed to loan Jay the money he needed that year.  Jerry believed that he took the 2002 crop proceeds, government payments, and Jay's equipment as collateral for the loan.  At the conclusion of the 2002 farming year, Jay turned over the proceeds of his 2002 crop to Jerry and Wright Land Company, including a portion of his government payments.  Jerry also held an auction ("**Auction**") where he sold all of Jay's farming equipment, except for Jay's personal vehicles, his household furniture, and his 315BL Caterpillar Excavator (the "**Track Hoe**").  When Jay became unable to make the payments on the Track Hoe, Jerry obtained a loan from Farm Credit Services and loaned Jay the money to pay the balance owed on the Track Hoe.  The Track Hoe continued to be a source of income for Jay and allowed him to provide a service for other farmers who needed excavation work on their land.  Jay also ran a seasonal business, Shur-A-Shot, LLC, that provided guided duck hunts for hunters.  On the property where Shur-A-Shot, LLC was located, there was a restaurant where meals were served to the hunters, and a hunting lodge where the  hunters could stay overnight.  Shur-A-Shot, LLC served as an additional source of income for Jay during the winter months.

Jay filed bankruptcy on February 25, 2004.  As of February 12, 2004, Jay owed St. Francis County $124,212.66 (plus interest since February 12, 2004 of 6 1/4

percent). (Joint Stipulated Exhibit 1, which was an account summary for Double Wright Partnership). In the bankruptcy case, St. Francis County filed a claim for $124,212.95. St. Francis County also filed the two *Complaints* that were the subject of this trial, and requested the following relief: that the Debtors be denied a discharge for failing to disclose assets on their petition and for failing to maintain adequate records; that the Track Hoe be turned over to the trustee; that the proceeds from the Auction of all of Jay's equipment be turned over to the trustee; that the improvements on the land where Shur-A-Shot was located be turned over to the trustee; and that these transfers be set aside under the Arkansas Fraudulent Transfers Act. The *Complaints* were set for trial; a summary of the testimony follows.

### B. Ronny Carey's Testimony

The first person called to testify was Ronnie Carey. Mr. Carey testified that he was the General Manager at St. Francis County, an agricultural cooperative that supplies farmers with chemicals, fertilizer, fuels, tires, batteries, and other supplies necessary for farming. He testified that a long-term relationship existed between Jay and Jerry Wright and St. Francis County, that Jerry was a member of the Board of Directors of St. Francis County for twenty-five to thirty years (his term ended in 2004), and that over their many years of farming, both Jerry and Jay had purchased farming supplies from St. Francis County and had accounts with St. Francis County.

Specifically, Jay (doing business as Double Wright Partnership in later years) had an account balance with St. Francis County at the end of the 2001 farming year totaling $154,432.17 (Plaintiff's Exhibit 1).[2]  Because of this outstanding balance, St. Francis County filed a complaint (Plaintiff's Exhibit 2) in state court on February 19, 2002, against the Debtors and Double Wright Partnership.[3]  Mr. Carey testified that he discussed Jay's 2001 outstanding balance with Jerry, and Jerry was aware that St. Francis County was going to file suit against his son and his son's partnership to recover the 2001 outstanding balance.  The state court lawsuit was pending when Jay filed his bankruptcy petition on February 25, 2004; no judgment had been entered at that time.

Mr. Carey testified that when St. Francis first began to do business with Jay, it did not request financial statements or other supporting documents from him.  Rather, he testified that the account was opened without any investigation, primarily because Jerry (Jay's father) was a member of the Board of Directors.  Further, St. Francis County did not take a security interest in any of Jay's equipment, crop proceeds, or

---

[2]Plaintiff's Exhibit 1 was a copy of Double Wright Partnership's invoices from St. Francis County, and a summary of Double Wright Partnership's account was also introduced into evidence (Joint Stipulated Exhibit 1).

[3]Hutchinson Flying Service, which is also under the management of Ronny Carey, also filed suit in state court against Jay to collect approximately $15,000 on a past due account.

6

government payments.  However, Mr. Carey testified that Jay told him that he was "going to pay [his balance with St. Francis County] with rice in the bins." (Trial Tr., 27, December 20, 2005).

Mr. Carey testified that he was aware that the last year that Jay farmed (2002), Jerry was financing his son's farming operation, and allowing Jay to use his equipment.  In 2002, when Jerry financed Jay, Jerry opened an additional account at St. Francis County, under the name of "Wright, D.W.;" Jerry Wright or Wright Land Company was solely responsible for this account.  At the end of the 2002 farming year, Wright Land Company paid the balance of this additional account in full.

Mr. Carey testified that he did not attend the Auction; that St. Francis County did send a representative; and that St. Francis County did not purchase any equipment nor receive any proceeds from the sale.

Mr. Carey also testified about the details of a CCC502 Farm Aid Operating Plan.  This is a form which farmers, who are applying for government assistance, must fill out.  It requests information regarding the farmer's intentions and plans for farming for that particular year.  For example, on a CCC502, a farmer is required to disclose such information as whether the land to be farmed is owned or rented, whether the equipment to be used is owned or rented, and exactly what the farmer intends to plant on the land.  Once the form is complete, it is submitted to the

7

government agency. If approved, the farmer will receive assistance of approximately $50,000 per entity. All CCC502's are completed and signed by the farmer under oath and penalty of perjury.

### C. Jay Wright's Testimony

Jay Wright testified that he and his wife, Mary, were engaged in a farming operation for approximately ten years under the name of Double Wright Partnership. Jay testified that he rented his farm land from his parents, Jerry and Audrey Wright, and Wright Land Company. Because Farm Credit refused to give Jay a 2002 crop loan, Jerry agreed to finance his farming operation for that year. In April 2002, Jay signed a promissory note (Plaintiff's Exhibit 8) to Wright Land Company for $423,960 for a 2002 crop loan. Jay testified that pursuant to the note, he gave all of his 2002 crop proceeds, his government payments, and the proceeds from the sale of his equipment to Wright Land Company.

Jay testified that his farming operation was unsuccessful in 2002, that he paid three-fourths of his government payments to Wright Land Company, and that he retained the other one-fourth to pay Double Wright Partnership's bills. Even after the money from the 2002 crop proceeds and the government payments was paid to Wright Land Company, Jay testified that he was unable to pay off the balance on the note to Wright Land Company.

8

Jay was presented with a copy of Wright Land Company's Bank Statement (Plaintiff's Exhibit 6), which showed two deposits from Double Wright Partnership to Wright Land Company. From that statement, he testified that he made two payments to Wright Land Company, one on February 14, 2002, for $9,000, and one on March 13, 2002, for $428.51. When questioned as to whether these two payments were related to the April 2002 promissory note, and thus made *before* the note was signed in April 2002, Jay then said he did not know whether the two payments were related to the April 2002 loan or a previous loan[4] from Wright Land Company.

Jay also testified regarding a list of deposits[5] from the 2002 crop proceeds that were made to Wright Land Company from Double Wright Partnership *after* the April 2002 promissory note was signed. Jay testified as to the following specific payments: October 30, 2002 payment of $42,095.92; October 31, 2002 payment of $23,211.84; November 1, 2002 payment of $27,512.31; November 14, 2002 payment of

---

[4]There was no evidence concerning a "previous loan."

[5]At trial, this exhibit was referred to as Plaintiff's Exhibit 9. The numbers on the exhibit were unclear, and the parties ultimately agreed to stipulate as to the payments listed on the exhibit. At this point, the Court recessed for lunch, and St. Francis County resumed questioning with a Schedule of Machinery Equipment, and Vehicles (taken from a March 16, 2000 Balance Sheet of Double Wright Partnership and labeled as Plaintiff's Exhibit 9, but referred to as Plaintiff's Exhibit 10). The list of deposits, which was originally referred to as Plaintiff's Exhibit 9, was not admitted into evidence and not received by the Court.

$2,087.71; November 14, 2002 payment of $37,576.48; and an undated payment of $40,400.

Jay also testified that all of the equipment that he owned and used in his farming operation, except for his personal vehicles, household furniture, and a Track Hoe, was sold at the Auction held by his father, on February 8, 2003. Jay testified that 100% of the Auction proceeds were paid to Wright Land Company and Jerry Wright because Wright Land Company had a first lien on all of his equipment. Jay testified that some of his father's equipment that he used in his 2001 and 2002 farming operations was placed in the Auction. Also, other farmers participated in the sale by placing items of equipment in the Auction. When asked if he had any records concerning the sale of the equipment that he used in his farming operation, Jay testified that he did not have *any records* of this equipment. Jay was questioned regarding a list of his equipment, which was prepared by Mr. V.L. Simmons, accountant for the Debtors (Plaintiff's Exhibit 20).[6] At the bottom of this list of equipment, there was a hand-written notation by Mr. Simmons stating that all of the equipment on the list had been repossessed by Jerry Wright. Jay testified that he did not recognize the list, and that he *did not* have *any records* of the equipment used in

_____

[6]At trial, this exhibit was referred to as Plaintiff's Exhibit 5; however, the document was labeled Plaintiff's Exhibit 20. *See infra* p. 13 and note 9.

his farming operation to compare to the list of his equipment prepared by Mr. Simmons.

Jay testified that he and Mary signed a 2001 CCC502 Farm Aid Operating Plan for Payment Eligibility Review (Plaintiff's Exhibit 3) under penalty of perjury in order to qualify for government payments for 2001. Opposing counsel led Jay through the information on the form. During cross examination, Jay testified that under penalty of perjury, he indicated on the 2001 CCC502 that he owned 100% of his equipment, as well as 100% of the equipment to be used by him to farm in 2001. But, Jay also testified that he used equipment in his farming operation that belonged to his father, as well as other members of his family, and he did not disclose the equipment that he borrowed from his father or other family members when providing the required information on the 2001 CCC502.

Jay also testified that he signed under penalty of perjury and filed a CCC502 with Farm Services Agency in order to qualify for his 2002 government payment (Plaintiff's Exhibit 4). Again, Jay testified that he indicated on the 2002 CCC502 that he owned 100% of the equipment to be used in his 2002 farming operation. However, he also testified that he used equipment belonging to his father and other family members in his farming operation, and did not disclose the borrowed equipment on the 2002 CCC502. As to the disposition of the equipment that he owned and the

equipment that he borrowed from his father, Jay testified that it was ultimately sold at the Auction.  He testified that he *did not* have *any type of record* or documentation of the equipment that he owned or that he borrowed from his father nor did he have any documentation regarding the equipment sold or not sold in the Auction.

Jay responded to questions regarding various other documents showing equipment belonging to him and Double Wright Partnership.  First, Jay testified that he submitted to Farm Credit Services a Schedule of Machinery, Equipment, and Vehicles from a March 16, 2000 Balance Sheet (Plaintiff's Exhibit 9),[7] showing that Double Wright Partnership had $240,000 worth of machinery, equipment, and vehicles.  Similarly, Jay testified that a Balance Sheet dated May 18, 2001 (Plaintiff's Exhibit 10), showed that Jay and Mary Wright personally owned intermediate farm assets, including vehicles equipment, worth $255,707.  Also, Jay testified that just two months prior to the filing of his bankruptcy petition, a December 31, 2003 Statement of Assets and Liabilities for Jay and Mary Wright[8] (Plaintiff's Exhibit 11) showed that

---

[7]The March 16, 2000 Balance Sheet is labeled Plaintiff's Exhibit 9; however, an earlier exhibit (a list of deposits from the 2002 crop proceeds that were made to Wright Land Company from Double Wright Partnership) was also referred to as Plaintiff's Exhibit 9.  *See supra* p. 9 and note 5.

[8]The December 31, 2003 Statement of Assets and Liabilities for Jay and Mary Wright was a document prepared by Jay's accountant, Mr. V.L. Simmons, for their use, and is *not* the Statement of Financial Affairs contained in his bankruptcy petition.  Any reference to the Statement of Assets and Liabilities will

Jay and Mary had machinery and equipment valued at $287,522.16, automobiles and trucks valued at $136,968.99, and wells valued at $39,867.61.  When asked about having any records of the disposition of any of the equipment listed on those documents, Jay responded that he did not have *any records* of the disposition of any of the equipment.  He testified that, "When [he] went out of business[,] everything that [he] had went to – went to Wright Land Company or Jerry Wright. [He has] had nothing since then. [He doesn't] have any records of any kind." (Trial Tr. 52, December 20, 2005).

Jay also testified that he did not recognize a Depreciation Summary for the year end December 31, 2002 (Plaintiff's Exhibit 20)[9] prepared by Mr. Simmons, who was the accountant for the Wrights for many years.  The summary listed numerous items of equipment owned and depreciated by Jay and Mary Wright and a handwritten note at the bottom of the document reflected that all of the equipment on that depreciation summary was repossessed by his father in 2003.  Jay identified Schedule L of Double Wright Partnership's 2002 tax return (Plaintiff's Exhibit 17), which showed

---

be in connection with the December 31, 2003 Statement of Assets and Liabilities for Jay and Mary Wright.

[9]Although the Depreciation Summary for the year end December 31, 2002, was marked as Plaintiff's Exhibit 20, at trial, it was referred to as Plaintiff's Exhibit 5.  *See supra* p. 10 and note 6.

depreciable property at the beginning of the 2002 tax year, in the sum of $668,707, and showed undepreciated assets with a book value of $229,927. Schedule L also showed at the end of the 2002 tax year assets with a net book value after depreciation of $268,827, and an increase in depreciable assets of over $100,000 in 2002. Jay testified that he was unaware of where any of the property listed on the 2002 tax return was located, and he did not have *any records* of the property listed on the return. Therefore, he was unable to explain how Mr. Simmons arrived at the numbers on the 2002 tax return. Jay also identified Schedule L of Double Wright Partnership's 2003 tax return, showing assets at the beginning of the 2003 tax year of $784,279, and assets having a net book value after depreciation of $268,827. Schedule L also showed at the end of the 2003 tax year assets with a net book value after depreciation of $161,663. Again, Jay testified that he was unaware of the location of the property listed on the 2003 tax return, and he had *no records* of the equipment listed on the tax return. Further, he was unable to explain where the numbers came from on the 2003 tax return.

Throughout his testimony, Jay consistently stated that he did not keep or maintain *any records* of any kind in regard to the equipment that he owned or used in his farming operation. Specifically, he testified that he had no records of the equipment on the following: the Schedule of Machinery, Equipment, and Vehicles

14

from a March 16, 2000 Balance Sheet; May 18, 2001 Balance Sheet of Double Wright Partnership; 2002 Depreciation Summary; and 2002 and 2003 tax returns. Jay further testified that he had *no record* of how the equipment was disposed of or where it could be located.

Jay's attorney asked him specifically *why* he had no records of his equipment. Jay's response was, "Well, when my father decided it was time for us to get out before he lost any more money messing with me, that he was going to liquidate everything and try to get him paid back. Since then I haven't had anything to keep a record of." (Trial Tr. 68, December 20, 2005). Jay testified that he had only a tenth grade education, and he had not received a GED. He testified that because of his lack of education, he relied heavily on his accountant for things such as record-keeping. Jay testified that he had made a $20,000 payment to St. Francis County that was to be applied to his account balance. In addition to the $20,000 payment, Jay also returned his stock in St. Francis County, which was valued at approximately $18,000. When asked if either the return of the stock or the $20,000 payment was reflected on the summary of his account with St. Francis County, Jay responded that it was not.

Jay testified that he received income during the last four years from a seasonal business he owned called Shur-A-Shot, LLC. Through Shur-A-Shot, Jay provided

guided duck hunts for hunters, as well as lodging and meals.[10]  On the property where

Shur-A-Shot was located, Jay testified that there were two structures, a restaurant

building and a hunting lodge.  Both the restaurant (valued at $117,464.29) and hunting

lodge (valued at $95,488.95) were listed on Jay's December 31, 2003 Statement of

Assets and Liabilities.  However, Jay testified that he did not own the two buildings;

rather, Jerry and Audrey owned the restaurant building and the hunting lodge.  Jay

disputed the December 31, 2003 Statement of Assets and Liabilities for Jay and Mary

by testifying that the accountant, Mr. V.L. Simmons, who prepared the statement,

must have just made up the fact that Jay owned the restaurant and lodge.[11]    J a y

testified concerning his purchase of the Track Hoe and how he began doing

excavation work for his father and other farmers.  On September 9, 2002, Double

Wright Partnership (with Jay and Mary signing as partners) entered into an installment

sale contract (Plaintiff's Exhibit 14) with Riggs Leasing Company for a 315BL

Caterpillar Excavator Track Hoe.  The installment sale contract stated a beginning

---

[10]Jay testified that there were signs (Plaintiff's Exhibits 12 and 13) advertising his duck guiding service going both east and west along Highway 70. The signs read "Wright's Shur-A-Shot, LLC" and advertised services including a duck lodge, a guide service, a shooting resort, and Track Hoe work.

[11]Specifically, when asked if he thought his accountant just made up the fact that he owned the restaurant and hunting lodge, Jay responded that he "must have, it doesn't belong to me, never has."  (Trial Tr. 53, December 20, 2005).

16

purchase price of $107,500, a down payment of $27,365.13, and a balance of $79,000. Jay disputed the fact that a down payment was ever made, but testified that he made monthly payments on the balance owed of $79,000 until November 2003. Jay testified that while he was making monthly payments on the Track Hoe, he used the Track Hoe to do excavation work on Jerry's land and on other people's land. He testified that he earned a profit from his excavation work with the Track Hoe.

According to Jay's testimony, in November 2003, he became unable to make the remaining payments on the Track Hoe, and Jerry gave him a check for $65,000 to pay the remaining balance owed on the Track Hoe. On November 11, 2003—three months before filing his bankruptcy petition—Double Wright Partnership executed a Bill of Sale (Plaintiff's Exhibit 19) transferring the Track Hoe to Wright Land Company.[12]  Thus, it was Jay's testimony that his father owned the Track Hoe. Jay testified that on the day he transferred the Track Hoe to Jerry, it was valued at $70,000. After the transfer, Jay was supposed to pay Jerry $14,000 a year in rent for his use of the Track Hoe; however, he was unsure if he made any rent payments to his father. Jay also testified that Jerry required him to maintain an insurance policy on the Track Hoe. He further testified that within the last year, his insurance company paid

---

[12]Jay testified that in order for Jerry to obtain a loan to give him the money to pay off the Track Hoe, Farm Credit Services required that a Bill of Sale be executed, and Farm Credit Services provided them with a form for a Bill of Sale.

for repairs of $25,000 on the Track Hoe.

Jay testified that as of the first day of the trial—December 20, 2005—the Track Hoe was sitting on Jerry's land, near Jerry's granary. Jay was shown photographs of the Track Hoe (Plaintiff's Exhibits 15 and 16).[13]  In the first photograph, the Track Hoe was shown parked behind the restaurant and the hunting lodge on the property where Shur-A-Shot was located, rather than behind the granary. The other photograph was a picture of the Wright's Shur-A-Shot sign posted in front of the restaurant and hunting lodge. Jay's explanation for the photos contradicting his testimony was that the Track Hoe had been moved to this location and parked near the hunting lodge and restaurant so that his nephews and his brother could haul grain out of the granary.

On cross examination, Jay explained that after he was unable to make the payments on the Track Hoe and his father gave him a check (Plaintiff's Exhibit 21) to pay it off, he gave his father a security interest (Security Agreement, Defendant's Exhibit 1)[14] in the Track Hoe, dated October 29, 2003.  In addition, Jay signed a Five Year Commercial Lease (Defendant's Exhibit 2) to lease the Track Hoe from Wright

---

[13]Plaintiff's Exhibit 16 was dated December 18, 2005, which was two days before the first day of testimony in this trial.  Plaintiff's Exhibit 15 was not dated.

[14]Defendant's Exhibit 1 and Plaintiff's Exhibit 22 are copies of the same security agreement on the Track Hoe.  The difference in the two exhibits is that Defendant's Exhibit 1 is not stamped with a file-marked date, and Plaintiff's Exhibit 22 is a file-marked copy.

Land Company for excavation work.

At the conclusion of Jay's direct examination, Jay was asked if he was aware that on his bankruptcy petition, in the Schedule of Affairs, where it requires the debtor to list the amount of the money and value of property that the debtor has disposed of in the past year, that Jay had answered "none."  Jay's response was, "I guess so."  (Trial Tr. 67, December 20, 2005).  Jay testified that the signatures on the petition were in fact his and Mary Wright's signatures, and that his answer to the question on the petition regarding the disposing of property was accurate.

### D. Terry Northcutt's Testimony

Terry Northcutt has been an accountant for thirty years.  She testified that she has her own accounting business in Marianna, Arkansas, and that farmers comprise about ninety-two percent of her clientele.  She testified that she regularly cautions clients not to use the corporation to conduct personal business.  She explained that when she is reviewing documents and bookkeeping records, she looks for certain indicators, such as loans to shareholders, loans to family members, repayment of those loans, insurance accounts, repair accounts, and medical expenditures, as evidence of the corporate entity being the alter ego of the person.

Mrs. Northcutt was asked to review the bank statements of Wright Land Company for 2001 through 2004.  In her review and in her opinion, she found

evidence that Wright Land Company functioned as the alter ego of Jerry Wright. Specifically, she found in Wright Land Company's records: loans to shareholders, loans to family members, medical expenditures, and insurance accounts. For instance, Mrs. Northcutt found evidence of loans to Double Wright Partnership and repayment of those loans, while no interest was charged on the loans. She stated that her review revealed that family loans were never repaid in full; rather, there were just transactions back and forth between Wright Land Company and Double Wright Partnership. She also stated that repayments could not be attributed to any specific loan, and that she was not able to determine if interest had been charged for these loans. For example, she explained that the initial check to Double Wright Partnership would state that it was for a loan, but the repayment check would not indicate the specific loan to which the payment should be applied, or whether interest was part of the payment, it would only say "loan repayment." She also stated that, while there were deposits from Double Wright Partnership to Wright Land Company, there was no indication on some of the deposits as to whether the payments were for rent. Mrs. Northcutt testified that she could not determine the amount of rental income Wright Land Company received for the lease of its land in 2002; that even though Wright Land Company was providing equipment to Double Wright Partnership, there was no income to Wright Land Company that would be attributable to any leasing of

20

equipment; and that she was unable to determine if there was any interest charged on the note based on the repayments of loans from Double Wright Partnership back to Wright Land Company.  Overall, Mrs. Northcutt testified that she has never seen an operation (such as Wright Land Company) that was structured this way, and she also testified that she had not ever reviewed a set of corporate records where the landlord would provide land, equipment use, and operating funds to a lessee in return for a twenty-five percent crop share.

Mrs. Northcutt specifically described several loans made from Wright Land Company to certain individuals.  For instance, she described:  a loan made to Richard Wright for $20,000 on March 24, 2004, a loan repayment of $20,000, no interest charged on the loan; loans to "R and G" or "B and G" in March 2004; a loan to Jay Wright on August 18, 2004 for $6,000, where there was no repayment on the loan; and loans to "Gary or Terry Todd" in October 2002 and February 2004.  She testified that there were two instances where it appeared that some interest was paid on the loans.   Mrs. Northcutt also testified that she found transactions between Jerry and Audrey Wright and Wright Land Company.  She explained that when money was loaned to Jerry and Audrey, and there was evidence of repayment, there was no indication that any interest was paid on these loans.  Specifically, she testified that concerning transactions between Jerry and Audrey and Wright Land Company, the

books showed the following: a loan of $28,000 on February 9, 2001; a loan of $18,000 on October 11, 2001; a loan repayment of $18,000 without interest in February 2002; a loan repayment of $46,000 without interest on February 6, 2002; and a loan repayment on September 25, 2002 of $2,785.57 (memoed "taxes repaid"); a loan repayment of $15,000 without interest on January 13, 2003; and a deposit of $19,500 from Jerry and Audrey on February 21, 2003, and memoed "loan for tractor;" and a check to Jerry and Audrey from Wright Land Company for $34,500 on March 15, 2003.

As for insurance expenses, Mrs. Northcutt testified that she found where there were corporate funds being used to pay premiums on life insurance for shareholders. Mrs. Northcutt explained that unless the corporation is the beneficiary of the policy or unless the corporation is the owner of that policy, then the corporation should not be paying the premiums. She testified that during the time period from January 1, 2001, to December 31, 2004, Wright Land Company paid over $110,000 in life insurance premiums for shareholders.

As for medical expenses, Mrs. Northcutt explained that unless the board of directors of a corporation has adopted what she referred to as a "Code Section 108 Medical Reimbursement Plan," then the corporation is not at liberty to use corporate funds to pay medical expenses of shareholders. She testified that she reviewed the

minutes of Wright Land Company, and that its board of directors had not adopted a Code Section 108 Medical Reimbursement Plan.  In the four years of records that Mrs. Northcutt was asked to review, she found evidence of the corporation spending $8,053.99 on shareholder's medical expenses, and "[she was] sure [that she had] missed some."  (Trial Tr. 97, December 20, 2005).

Mrs. Northcutt testified on cross examination that there could have been transactions outside that time frame that she would be unaware of because she was only given four years of records to review.  She also stated that if there was a repayment for a loan and it was more than the actual loan amount, she considered the amount over the loan as an overpayment, rather than interest, unless it was noted as interest.

### E.  V.L. Simmons' Testimony

V.L. Simmons has been an accountant for forty-four years.  He has been the accountant for Jerry and Audrey Wright and Wright Land Company for many, many years.  Mr. Simmons testified that he obtained all the information for the tax returns from their canceled checks, deposit slips, bank statements, and invoices.  If Mr. Simmons had questions beyond the information that the Wrights provided him, he would call Audrey or Mary Wright. Mr. Simmons testified that when determining what property to depreciate on the tax return and the amount of depreciation on a

piece of equipment, he would use equipment invoices and canceled checks.  He testified that as far as the money repaid to Wright Land Company from Double Wright Partnership for the 2002 farm loan, there is no way to determine what is principle and what is interest.  He testified that he explained to Jerry that he had to charge his son interest on these loans, but that Jerry refused to charge Jay any interest.  Further, Mr. Simmons testified that there was no way to tell the Court how much rent was paid to Wright Land Company for the year 2002.  However, he stated that as far as he could tell, Double Wright Partnership did not pay *any* rent to Wright Land Company in 2002.

Mr. Simmons identified a schedule of equipment belonging to Jay and Mary Wright (Plaintiff's Exhibit 20)[15] on which he had made a hand-written notation at the bottom which stated that, "This equipment was repoed by Wright Land Co. on or about 11-11-03.  Jay took bankruptcy."  When questioned about the source of this information, Mr. Simmons testified that he got that information from Jerry.  The schedule of equipment included the Track Hoe and showed a cost of $90,523, and an undepreciated value of $50,693.  Mr. Simmons was unable to testify as to the location or whereabouts of any of the equipment on the schedule of equipment.

When shown the 2002 and 2003 tax returns for Double Wright Partnership, Mr.

---

[15]At trial, this exhibit was referred to as Plaintiff's Exhibit 5.

Simmons testified that the information used to determine the depreciation on those tax returns was obtained from Double Wright Partnership's books and records. He was provided records to determine all of the numbers on the tax returns. When shown the December 2003 Statement of Assets and Liabilities for Jay and Mary Wright, Mr. Simmons testified that he prepared that document and derived the figures for the machinery and equipment, automobiles and trucks, and the wells from canceled checks and equipment invoices. Specifically, Mr. Simmons testified that he included the restaurant and hunting lodge on Jay and Mary's 2003 Statement of Assets and Liabilities because of canceled checks shown to Mr. Simmons for the restaurant and hunting lodge. However, Mr. Simmons also stated that it was his understanding that the money for the restaurant and hunting lodge came from Jerry and Audrey Wright.

In sum, Mr. Simmons testified that he did not make up any of the figures that were on the balance sheets, the 2003 Statement of Assets and Liabilities, or the tax returns, and that he had documentation for all of the figures except the estimates on depreciation because there is no way to predict the life of an asset.

On cross examination, Mr. Simmons was unable to explain why the equipment was listed on the 2003 Statement of Assets and Liabilities if Jerry had sold the equipment at the Auction in February 2003. Mr. Simmons, while unsure of the dates of the Auction, agreed that if the Auction occurred in February 2003, there must have

been a mistake on the 2003 Statement.  He also agreed that if the Auction occurred in February 2003, then the balance sheet (it is unclear from the testimony which balance sheet he is referring to) contained errors as well.

Further, Mr. Simmons testified that the Wrights depended on him considerably, sending him all of their documents quarterly.  Mr. Simmons explained that he regularly reviewed the tax returns with Audrey after he prepared them, that Jerry comes to the office with Audrey "once in awhile," and that he rarely sees Jay or Mary. Mr. Simmons testified that the Wrights sign the documents that he prepares. (Trial Tr. 118, December 20, 2005).

As to the corporate structure of Wright Land Company, Mr. Simmons testified that he explained to the Wrights the laws on medical expenses, insurance policies, and charging interest on loans, but that the Wrights had not followed his advice.

**F.  Jerry Wright's Testimony**

Jerry Wright testified that he lived and farmed in St. Francis County, and that his son Jay, who also farmed in St. Francis County, rented his farm land from him. Jerry testified as to the details of a 2002 crop loan that he made to his son.  He testified that when Farm Credit Services refused to issue Jay a farm loan for 2002, he decided to help his son with his financing; that Jerry obtained a loan from Farm Credit Services to finance Jay's farming operation in 2002; and that in April 2002, Jay signed

a promissory note (Plaintiff's Exhibit 8) to Wright Land Company.   Jerry testified that as collateral for the loan, Wright Land Company took a security interest in the 2002 crop proceeds, government payments, and Jay's equipment.

Jerry explained that near the end of the 2002 farming year, Jerry advised Jay that it was time to cease his farming operation, and that acting as Jay's banker, he liquidated everything Jay had.   Jerry testified that he received all of the 2002 crop proceeds; that Jay repaid him in the form of a check, and that he had all the checks that Jay had given to him as repayment on the 2002 crop loan.   Jerry testified that Wright Land Company used three-fourths of that money as repayment on the 2002 crop loan from Farm Credit Services, and one-fourth of the money was collected as rent and used by Wright Land Company toward other loans that it had with Farm Credit Services.   But, Jerry testified that ultimately, he turned over all of the 2002 crop proceeds to Farm Credit Services to pay on the 2002 crop loan, but that he had no records to determine what portion of the crop proceeds was applied as rent from Double Wright Partnership and what portion of the crop proceeds was applied directly to the 2002 crop loan from Farm Credit Services.   When asked what portion of the 2002 crop proceeds was applied to the principle and interest on the 2002 crop loan, Jerry responded that he had no records to distinguish payment of principle from payment of interest.   Jerry further stated that because the 2002 crop proceeds were

27

insufficient to repay the loan, there was no need to distinguish the portion applied to rent liability from the portion applied to principle and interest liability.

Jerry testified that he had made crop loans in the past, and that he had rented land on a crop share in the past as well, and in those situations, it was customary that the landlord got his share before the lender got his share.  That was how he had always done it.

Jerry testified that because of the shortfall after the 2002 crop proceeds and government payments were used to pay on the 2002 crop loan from Farm Credit, he held the Auction on February 8, 2003, where he sold Jay's equipment, and claimed ownership in Jay's remaining equipment.  Jerry sold some of his own equipment at the Auction as well.  Jerry testified that it was customary to open auctions to other farmers so that they could place items of equipment in the sale, and other farmers did participate in the Auction.  Jerry testified that all of the proceeds from the Auction went to Wright Land Company.  After the Auction, Jerry testified that he still owed approximately $111,000 on the loan from Farm Credit Services, and that Wright Land Company was still paying on the note. On cross examination, however, Jerry testified that the note "might be paid off now."  (Trial Tr. 60, March 28, 2006).

 Jerry also testified that there was no record of the equipment that previously belonged to Jay which was sold at the Auction.  In order to clarify, Jerry was asked

28

if the equipment that was sold at the Auction was the same equipment listed on Jay and Mary's December 31, 2003 Statement of Assets and Liabilities. Jerry responded that the December 31, 2003 Statement of Assets and Liabilities was in error because Jay did not own any equipment after February 8, 2003.

One piece of equipment that Jerry testified about in greater detail was the Track Hoe. He testified that Jay purchased the Track Hoe in September 2002 on a lease/purchase agreement. However, Jerry disputed the fact that Jay made an approximate $27,000 down payment on the Track Hoe, despite the written record of this payment in the installment sale contract. Jerry did agree that Jay was making monthly payments on the Track Hoe.

Jerry testified that in November 2003, Jay became unable to make his payments on the Track Hoe, and that he was going to lose the Track Hoe. Jerry testified that to help Jay out, he went to Farm Credit Services, and requested that Farm Credit Services loan him the money to buy the Track Hoe. Farm Credit Services agreed to finance the Track Hoe for Wright Land Company so that Jerry could help keep his son from losing the Track Hoe. Jerry testified that he had a rolling loan with Farm Credit, and that Farm Credit Services loaned him $65,000 to pay off the Track Hoe. According to Jerry's testimony, he gave Jay a check (Plaintiff's Exhibit 21) for $65,000, dated November 11, 2003, to pay off the balance on the Track Hoe. The memo line of the

29

check stated that the check was a "loan."  The day after Wright Land Company issued

Jay the $65,000 to pay off the Track Hoe, Wright Land Company took a security

interest in the Track Hoe (Defendant's Exhibit 1).  The next day, Jay assigned the

Track Hoe to Wright Land Company.  Jerry testified that he later removed the loan

from his line of credit with Farm Credit Services, and Farm Credit Services gave him

a regular loan for the balance on the Track Hoe.  When questioned about the date on

which the security agreement (Plaintiff's Exhibit 22)[16] on the Track Hoe was filed in

the St. Francis County Clerk's Office, Jerry acknowledged that the security agreement

was filed on March 28, 2005.  This filing date indicates that the security agreement

was filed a year and a half after Wright Land Company issued a check, memoed

"loan" to Double Wright Partnership to pay off the balance of the Track Hoe.  Despite

the evidence, Jerry testified that he treated the Track Hoe as if he owned it, rather than

just having a security interest in it.

Jerry testified that his son used the Track Hoe to do a significant amount of

excavation work on his land and that Jay also used the Track Hoe to work on land

owned by other farmers.  Jerry testified that while others paid Jay for the Track Hoe

services, he did not pay Jay for the Track Hoe work; rather, he considered it a credit

against the money Jay owed Jerry.  Jerry also testified that Jay did not pay him any

---

[16]*See supra* p.19 and note 14.

30

rent for using the Track Hoe.  Jerry testified that Jay operated and controlled the Track Hoe; however, he stated that Jay did so under his supervision.  As to ownership of the Track Hoe, Jerry testified that the Track Hoe belonged to him.

On cross examination, Jerry testified that he agreed that Wright Land Company would lease the Track Hoe to Double Wright Partnership, and a Five-Year Commercial Lease (Defendant's Exhibit 2) was executed.  The Five-Year Commercial Lease was notarized by Mr. V.L. Simmons.

Also on cross examination, Jerry explained in more detail the circumstances surrounding the Track Hoe.  He testified that when Jay could no longer make his payments on the Track Hoe, Jerry went to Mac Adams, CEO of Farm Credit Services in Marion, Arkansas, where he had a standard line of credit with Farm Credit Services, and was able to draw the money quickly in order to pay off the Track Hoe.  Jerry stated that Mac Adams then advised him to fill out a loan application (Defendant's Exhibit 3) for a regular loan on the Track Hoe.  This loan was approved by Farm Credit Service, and Jerry signed a promissory note to Farm Credit for $63,268 (Defendant's Exhibit 4).  Jerry testified that at the time of the trial—March 28, 2006—he was still making payments on the note for the Track Hoe.  The payments were approximately $14,000 a year, and the loan was scheduled to mature on February 2009.  As part of the loan, Wright Land Company gave a security interest to Farm

Credit Services in the Track Hoe.  The security agreement (Defendant's Exhibit 5) was executed on November 17, 2003.  Jerry testified that he signed the security agreement on behalf of Wright Land Company, and that he and Audrey both signed individually.

Jerry also testified about Jay's duck guiding business, Shur-A-Shot, which began in 2001 or 2002 and continued through the 2006 duck season.  Jerry testified that Jay ran the duck guiding operation (Wright's Shur-A-Shot, LLC) with the consent of both Jerry and Audrey.  According to Jerry, Jay "drew up" the Wright's Shur-A-Shot, LLC sign; Jay paid Jerry rent to guide hunters on the land; and Jerry and Audrey helped Jay run the operation.  (Trial Tr. 31, March 28, 2006).  Jerry testified that he and Audrey personally own the hunting lodge and the restaurant.  Jerry testified that Double Wright Partnership's tax returns containing the restaurant and hunting lodge as depreciated items was in error.  Further, it was also in error that Jay and Mary's December 2003 Statement of Assets and Liabilities included the restaurant and hunting lodge.  Jerry testified that there were errors made by Mr. Simmons, and that Jay had plans to hire a new accountant and have the errors corrected.

Jerry testified that in the past, he and his family relied heavily on Mr. Simmons' advice as to how to operate their business.  Specifically, Jerry testified that he and Audrey relied on Mr. Simmons' advice on keeping the minutes of Wright Land

32

Company.   Jerry identified a grouping of documents as the entire set of minutes for Wright Land Company (Plaintiff's Exhibit 23). He testified that there were very few board meetings held for Wright Land Company, and that the minutes were simply a form that Jerry and Audrey completed and signed.  When asked if he was aware of any other set of minutes from the board meetings of Wright Land Company, Jerry replied that he was not.  He stated that each year, he and Audrey went to Mr. Simmons' office, filled out these forms, signed them, and that was the corporate activity for the year.  However, Jerry testified that they were only following Mr. Simmons's instructions.

Jerry testified that Wright Land Company made loans to other members of his family over the last few years.  For instance, Jerry testified that he loaned Richard Wright, his grandson, $20,000.  He stated that Richard repaid the loan to Wright Land Company, that a promissory note was not issued, that a security interest was not taken, and that corporate minutes were not executed evidencing the transaction.   Jerry testified that a second loan to a family member was made in March 2004.  He stated that the loan was to Tammy Spicer, his daughter, that it was for $80,000, that when Tammy purchased a home at an auction sale, she did not realize that she had only twenty-four hours to come up with the purchase amount.  He testified that in order to help Tammy, the family pulled the money together, put the money into a Wright Land

Company account, and then he wrote a check for $80,000 from the Wright Land Company account to Tammy to cover the cost of the house. There were no corporate minutes regarding this transaction. Jerry stated that there were also other transactions such as the loan to his daughter that occurred during the last several years, and they occurred in the same fashion. However, Jerry testified that Mr. Simmons never told him not to make loans from Wright Land Company to family members.

In conclusion, Jerry stated that he felt confident that all of the 2002 crop proceeds, government payments, and proceeds from the Auction were turned over to Wright Land Company, and that Wright Land Company was entitled to all of those payments.[17] He testified that as of the second day of testimony in this trial—March 28, 2006—Jay did not own anything, except the home that he lived in.

**G. Mac Adams' Testimony**

Mac Adams testified that he is a loan officer at Farm Credit Services, and in that capacity, has worked with Jerry Wright and Wright Land Company. He stated that for the past twenty-plus years, he has had a business relationship with Wright Land Company and a relationship with Jerry and Audrey Wright individually. He

---

[17]The proof is that because Jerry did not take a perfected security interest in the crop *proceeds* or *government payments*, this money should have been recovered for unsecureds under 11 U.S.C. § 544. The record is insufficient to explain why the panel Chapter 7 Trustee did not pursue this recovery.

explained that crop loans issued from Farm Credit Services work in such a way that it gets paid first from the proceeds of the crop.

Mr. Adams testified that in late 2003, Farm Credit Services sold 201 acres in Humphries, Arkansas to Jerry Wright. Farm Credit Services financed the transaction, making a $250,000 loan. When a track hoe was needed to help with a boundary issue in the southwest corner, Mr. Adams stated that he encouraged Jerry to acquire the Track Hoe from Double Wright Partnership. He explained that he gave this advice because it would cost less money to purchase the Track Hoe than to pay someone else to do the excavation work.

Mr. Adams testified that initially Farm Credit Services advanced $63,268 to Wright Land Company on its operating line of credit to purchase the Track Hoe on November 11, 2003, and then Wright Land Company applied for a new loan. Mr. Adams testified that the loan was submitted to the committee at Farm Credit Services for approval, and included in the written information given to the committee was a statement of the purpose for the loan. Mr. Adams read the following statement from the documents presented to the committee that would approve the loan, "'This particular piece of equipment will be used in the construction of levees and to make structural improvements to real estate and fish ponds recently acquired. Once these'–excuse me–'Once these improvements have been completed, borrower plans

to liquidate this piece of machinery and equipment.'" (Trial Tr. 73, March 28, 2006).

Mr. Adams testified that on November 13, 2003, Farm Credit approved the new loan

for the Track Hoe and credited the $63,268 back to the operating line of credit.   Mr.

Adams testified that Farm Credit Services prepared the paperwork, consisting of the

loan application (Defendant's Exhibit 3), the promissory note (Defendant's Exhibit

4), and a security agreement dated November 17, 2003 (Defendant's Exhibit 5); filed

the security interest with the St. Francis County Clerk on November 19 and with the

State of Arkansas on November 21; and filed a UCC Financing Statement

(Defendant's Exhibit 6) on November 21, 2003.  He testified that as of October 26,

2005, Wright Land Company owed $52,033.27, with interest accrual of $22,079.03,

and that all scheduled installment payments were current as of March 28, 2006, the

date of the second hearing in this matter.  Mr. Adams noted during his testimony that

Farm Credit Services typically does not run a lien check on the equipment before it

takes a security interest in it.

On cross examination, Mr. Adams gave the following testimony as to *his*

*opinion* of who owned the Track Hoe.  Because Farm Credit Services loaned Wright

Land Company the money to purchase the Track Hoe and pay off the Double Wright

Partnership's debt on the Track Hoe, he testified that Wright Land Company was the

owner of the Track Hoe.  When Farm Credit Services closed the loan with Wright

36

Land Company for the Track Hoe, it received a Bill of Sale from Double Wright Partnership to Wright Land Company; thus, any testimony contrary to his opinion that Wright Land Company owned the Track Hoe was incorrect and was disregarded by him, including a second security agreement regarding the Track Hoe, filed March 28, 2005.

Mr. Adams testified that he was aware that Farm Credit Services refused to finance Jay's farming operation after 2001 farming year, and that Wright Land Company supplied Jay with his crop loan in 2002. When questioned as to whether he was aware that Wright Land Company was using some of the money on its line of credit from Farm Credit Services to fund Jay's operation, he responded, "I remember something like that. Again, I don't remember specifically Jerry – but I was made aware of it at some point in time, yes." (Trial Tr. 74, March 28, 2006). Mr. Adams testified that Wright Land Company had other outstanding loans with Farm Credit Services that were unrelated to the 2002 crop loan for Jay, that all loans with Wright Land Company were current, including the loan for the purchase of the Track Hoe, and that there have never been any delinquencies.

## II. FINDINGS OF FACT

Conflicting versions of the facts were presented at trial. To the extent that a fact stated by Jay Wright or Jerry Wright conflicts with a fact contained in a written

37

document, the Court finds the fact to be as presented in the document.  The Court finds the testimony of both Jay and Jerry Wright to be self-serving and unreliable. Under this premise, the Court makes the following findings of fact.

1.   The Court finds that some of the financial documents introduced into evidence were in Jay and Mary Wright's name personally, and some were in Double Wright Partnership's name, and the contents appear to overlap.  Thus, it was difficult to determine from the documents whether the assets were owned by Jay and Mary Wright personally, or Double Wright Partnership.  The Court finds that Jay and Mary Wright, as individuals, and the entity, Double Wright Partnership, were one and the same.  There was no evidence that Double Wright Partnership existed as a separate legal entity. (Hereinafter referring to Jay and Mary Wright d/b/a Double Wright Partnership as "**Jay**").

2.   The Court finds that Wright Land Company was the alter ego of Jerry and Audrey Wright.  The evidence clearly showed that corporate funds were being used to make loans to shareholders and to family members.  The loans were never repaid in full, and there was no interest charged on the loans.  The evidence showed that corporate funds were being used to pay life insurance premiums and shareholder's medical expenses. Further, the evidence showed that Wright Land Company's records revealed an unusual corporate structure in that it provided land, equipment use, and

38

operating funds to a lessee in return for a twenty-five percent crop share. In essence, Jerry and Audrey Wright had absolutely no regard for Wright Land Company's corporate structure. Under these circumstances, the Court will disregard the corporate facade. (Hereinafter referring to Jerry and Audrey Wright d/b/a Wright Land Company as "**Jerry**").

3.   Throughout Jay's many years of farming, St. Francis County let Jay purchase items on credit. St. Francis did not take a security interest, and instead, relied on Jay's promise to pay. Jay did not follow through with his promise to pay off this loan, and in February 2002, St. Francis County filed a lawsuit against Jay in state court. As of February 12, 2004, Jay owed St. Francis County $124,212.66, plus interest accruing after February 12, 2004 of 6 1/4 percent (Joint Stipulated Exhibit 1).

4.   Jay filed bankruptcy on February 25, 2004. A Trustee was appointed. The Trustee filed a Report of No Distribution on June 23, 2004. (Entry on docket between 16 and 17). The Trustee reported that this was a no asset case and that there was no property available for distribution over and above that exempted by law.

5.   The Court finds that Jerry loaned Jay the money to conduct his farming operation in 2002. However, despite the testimony that Jerry had a security interest in all 2002 crop proceeds, government payments, and equipment, the Court finds that there is insufficient evidence that Jerry took a security interest in the crop *proceeds*

39

or *government payments*.  This finding is based on the actual language in the April 10, 2002 Promissory Note, which describes the collateral for the loan, and does not contain the words "proceeds" or "government payments," as follows:

> Unless waived in writing by the Holder, until all liabilities of the borrowers under this loan have been paid and satisfied in full, the borrowers covenant and agree that:
>
> 1.  Payment of the loan is secured by all crops growing or to be grown on real estate and all harvested crops and processed crops, whether or not produced by Borrowers/Debtors.
>
> 2.  All equipment, all spare parts and special tools for such equipment, all motor vehicles and all fixtures.
>
> . . .

Moreover, the Court finds that there was insufficient evidence that the security interest in the equipment and crops was properly perfected.  Because a UCC Financing Statement was not introduced or accepted into evidence, the unrefuted evidence is that Jerry did not perfect his security interest in Jay's equipment or crops.  Further, even if Jerry had properly filed a UCC Financing Statement and put the UCC Financing Statement into evidence, there is insufficient evidence that he took a security interest in the crop *proceeds* or *government payments*.

6.  The Court finds that Jay received the 2002 crop proceeds and transferred them to Jerry.  The dates and amounts of the payments transferred to Jerry were as follows: a $42,095.92 payment made on October 30, 2002; a $23,211.84 payment

40

made on October 31, 2002; a $27,512.31 payment made on November 1, 2002; a $2,087.71 payment made on November 14, 2002; a $37,576.48 payment made on November 14, 2002; and an undated payment of $40,400.  Jay transferred crop proceeds in the amount of $172,884.26 to Jerry, even though there was insufficient evidence that Jerry took a security interest or perfected this alleged interest in the proceeds.[18]

7.  The Court finds that Jay owned a significant amount of farming equipment, and to the extent that Jay's testimony is inconsistent with the documents introduced into evidence, the Court finds Jay's testimony to be unreliable.  Specifically, the Court finds that Jay owned the following:  the equipment listed on the March 16, 2000 Schedule of Machinery Equipment and Vehicles (including machinery and equipment, automobiles and trucks, and wells); the equipment listed on the December 31, 2002 Depreciating Summary; the equipment as shown on the December 31, 2003 Statement of Assets and Liabilities; any equipment included in the intermediate farm assets as shown on the May 18, 2001 Balance Sheet of Jay and Mary Wright personally; and

---

[18]The Court notes that both Jerry and Jay testified that Jerry received twenty-five percent of the crop proceeds as rent for Jay's use of the land.  No document evidencing this lease was put into evidence.

the assets depreciated on the 2002 and 2003 tax returns.[19]  There were *no records* from the Auction, and therefore, the Court is unable to determine the amount of the proceeds Jerry received from the sale of Jay's equipment. The Court finds that Jay transferred this equipment to Jerry at some point either before or at the time of the February 8, 2003 Auction.

8.  The Court finds that pursuant to an Installment Sale Contract, Jay purchased the Track Hoe on September 9, 2002, from Riggs Leasing Company.  He made a down payment of $27,365.13, and made monthly payments until the fall of 2003.  On October 29, 2003, Jay and Jerry executed a Security Agreement for the Track Hoe. On November 11, 2003, Jerry loaned Jay $65,000 (check #10893, memoed "loan") to pay off the remaining balance on the Track Hoe.  Then, on that same day, a Bill of Sale was executed transferring the Track Hoe from Jay to Jerry.  Sixteen months after the transfer of the Track Hoe, on March 28, 2005, and after the bankruptcy filing, Jerry attempted to perfect his interest in the Track Hoe by filing the Security Agreement with the St. Francis County Clerk's Office.  The Court finds that Jay retained complete control and possession of the Track Hoe for use as a source of income, and transferred only legal title (Bill of Sale) to Jerry on November 11, 2003.  The Court

---

[19]The Court does not imply that these lists are cumulative, each listing additional equipment, but recognizes that the lists may overlap.

further finds that this transfer was made within one year of the filing of the bankruptcy petition (February 25, 2004), and that Jay failed to disclose the transfer on his bankruptcy petition Statement of Financial Affairs.

9. The Court finds that Jay and Jerry changed their minds as to ownership of the Track Hoe. Initially, Jerry and Jay decided that Jerry would loan Jay the money to purchase the Track Hoe, and the loan would be secured by the Track Hoe. A security agreement and a Five-Year Commercial Contract were executed. Then, Jay transferred ownership of the Track Hoe to Jerry, giving his dad a Bill of Sale for it. After bankruptcy, Jerry filed a security agreement so that if, in fact, the transaction was not found to be a sale, then at least the loan Jerry made to Jay would be secured and perfected. Nothing illustrates Jay and Jerry's fraudulent intent better than their numerous efforts to be sure no creditor could reach the Track Hoe. The Court finds all of these transactions were made with the intent to keep the Track Hoe out of reach of third party creditors.

10. The Court finds that Jay owned the restaurant and hunting lodge located on the land where he conducted his Shur-A-Shot business. The Debtors listed both structures as assets on their December 31, 2003 personal Statement of Assets and Liabilities. The restaurant was listed at $ 117,464.29 and the hunting lodge was listed at $95,488.95 (amounts noted to be before depreciation). Jay also depreciated the

hunting lodge on Double Wright Partnership's 2002 and 2003 tax returns.   Jay advertised the duck guiding service as his own.   However, Jay did not list the restaurant and hunting lodge on his bankruptcy schedules and Statement of Financial Affairs.  At trial, he testified that he did not own the restaurant and hunting lodge, and Jerry testified that he and Audrey owned the two structures personally.   No documentary evidence was presented to prove Jerry and Audrey's ownership interest of either the structures or the land where the structures were located.  The Court relies on Jay's personal December 31, 2003 Statement of Assets and Liabilities and the 2002 and 2003 tax returns, and finds that Jay owns the restaurant and hunting lodge.

11.  The Court finds that there was an appalling lack of record keeping by the Debtors.  The Debtors did not keep or maintain *any records* of any kind regarding the equipment Jay owned or that he borrowed from Jerry to use in his farming operation. Further, there were no Auction records.  There was not one document to prove what equipment was sold, who purchased it, what the price was, or to prove that the Auction even occurred.

12.  The Court finds that the Debtors' failure to keep or maintain records made it impossible for their creditors to ascertain the Debtors' financial condition.

### III.  CONCLUSIONS OF LAW

1.  Because there was insufficient evidence that Double Wright Partnership

existed as a separate legal entity, the Court finds that Jay and Mary Wright, as individuals, and the entity, Double Wright Partnership, were one and the same.

2.  The Court finds that Wright Land Company was the alter ego of Jerry and Audrey Wright.  Thus, the Court pierces the corporate veil, and disregards the corporate facade of Wright Land Company.

3.  Because of Jay and Mary's failure to keep and maintain records and because this failure prevented the creditor from ascertaining the Debtors' financial condition, the Court denies the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(3).  In the alternative, because Jay and Mary transferred their property within one year of the bankruptcy filing with the intent to defraud their creditors, the Court also denies the Debtors' discharge pursuant to § 727(a)(2).

4. The Code authorizes only the Chapter 7 Trustee to bring a fraudulent transfer claim or a preferential transfer claim under 11 U.S.C. §§ 547 and 548.  St. Francis County needed a Court order granting it permission to bring a fraudulent transfer or preferential transfer claim.  St. Francis failed to request permission from the Court, and thus, does not have standing to bring a fraudulent transfer or a preferential transfer claim under the Bankruptcy Code.

5. Because the remaining state law fraudulent transfer claims do not have any effect on the administration of the bankruptcy estate, the Court finds that it does not

45

have "related to"jurisdiction, and the Court will not address the remaining state law fraudulent transfer issues.

## III. ANALYSIS

Debtors filed their chapter 7 bankruptcy petition on February 25, 2004. St. Francis County filed a claim in this case based on the amount owed to St. Francis County by the Debtors. St. Francis County filed a *Complaint Objecting to Discharge* against the Debtors and a *Complaint* to set aside fraudulent transfers against Jerry and Audrey Wright and Wright Land Company. At trial, St. Francis County asserted that the Debtors should be denied a discharge for two reasons: 1) because with the intent to hinder, delay, or defraud creditors, the Debtors transferred or concealed property of the debtor within one year before the filing of the petition pursuant to 11 U.S.C. § 727(a)(2), and 2) because the Debtors failed to maintain adequate records from which the Debtors' financial condition might be ascertained pursuant to 11 U.S.C. § 727(a)(3). St. Francis County also argued that certain fraudulent transfers be set aside under the Arkansas Fraudulent Transfers Act and other relevant provisions of the bankruptcy code. Specifically, St. Francis County requested that the Track Hoe be turned over to the trustee; that the proceeds from the Auction of all of Jay's equipment be turned over to the trustee; and that the improvements on the land where Shur-A-Shot was located be turned over to the trustee.

## A.  WHETHER  DEBTORS SHOULD BE DENIED THEIR DISCHARGE

### 1.  Whether Debtors Failed to Maintain Adequate Records

The first provision of the Bankruptcy Code upon which St. Francis County's objection to discharge is based is 11 U.S.C. § 727(a)(3), the Debtors' failure to keep adequate records.  Section 727(a)(3) of the Code states:

> (a) The court shall grant the debtor a discharge, unless-
>
> * * *
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

Because intent is not an element required for denial of discharge based on failure to keep adequate records, *In re Pulos*, 168 B.R. 682 (Bankr. D. Minn. 1994), the standard under § 727(a)(3) is one of reasonableness.  *In re Beshears*, 196 B.R. 468 (Bankr. E.D. Ark. 1996).  Under section § 727(a)(3), the Debtor is required "to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *Id*. (quoting *Koufman v. Sheinwald*, 83 F.2d 977 (1st Cir. 1936)).  The party objecting to a debtor's discharge bears the initial burden to prove that the debtor failed to keep and preserve his financial records and that this failure prevented the party from ascertaining the debtor's financial condition.  *In re*

47

*Womble*, 108 Fed. Appx. 993, 2004 WL 2185744 (5th Cir. 2004) (citing *In re Dennis*, 330 F.3d 696 (5th Cir. 2003)). Although a debtor's financial records need not contain full detail, there should be written evidence of the debtor's financial condition. *Id.*

If this initial burden is satisfied, the burden shifts to the debtor to prove that the inadequacy is justified under all the circumstances of the case. *Id.* The factors to be considered in determining whether the inadequacy is justified under § 727(a)(3) are: the debtor's education, the debtor's business experience, the sophistication of the debtor, the volume of the debtor's business, the complexity of the debtor's business, the debtor's personal financial structure, and any other circumstances that should be considered in the interest of justice. *Beshears*, 196 B.R. at 474; *Womble*, 108 Fed. Appx. at 996 (2004 WL 2185744).

The first step in the analysis under § 727(a)(3) is whether St. Francis County met its burden of proving that the Debtors failed to keep and preserve their financial records and that this failure prevented St. Francis County from ascertaining the Debtors' financial condition. Based on the testimony of Jay and Jerry alone, it is clear that the Debtors did not keep or maintain *any records* of any kind regarding the equipment Jay owned or that he borrowed from Jerry to use in his farming operation, or the equipment sold or not sold at the February 8, 2003 Auction. As to the equipment that Jay owned or that he borrowed from his father, the

48

documents—including a depreciating summary dated July 21, 2003, tax returns for 2002 and 2003, and a December 31, 2003, Statement of Assets and Liabilities (prepared by Mr. V.L. Simmons, the accountant)—revealed a substantial amount of depreciating equipment belonging to Jay.  However, Jay specifically disputed the fact that he owned the equipment listed on the December 31, 2003 Statement of Assets and Liabilities because he testified that his father sold all of his equipment in February 2003 at the Auction. When asked whether he kept or maintained any records of the equipment listed on the other documents, such as the tax returns and the depreciating summary, Jay testified that he did not keep or maintain *any records* of his own as to this equipment.  Further, although both Jay and Jerry testified that Jerry loaned his son equipment to use in his farming operation, Jay testified that he did not keep *any records* of the equipment that his father loaned to him.  Of even greater importance in this analysis is the fact that there were *no Auction records*.

In order to meet its burden under § 727(a)(3), St. Francis County must prove that the Debtors failed to keep and maintain financial records and that their failure prevented St. Francis County from ascertaining Jay's financial condition.  Based on the evidence presented, St. Francis County met its burden of proving that the Debtors failed to keep and maintain adequate records.  The Debtor himself testified that he failed to keep or maintain *any records* of the equipment he owned or what his father

loaned to him.  Also, there was not one document from the Auction, where the Debtor alleged that all of his equipment was sold, to even prove that an Auction took place. Moreover, St. Francis County met its burden of proving that Jay's failure to keep records prevented St. Francis County from ascertaining his financial condition.  Not only did Jay fail to keep *any records* of the equipment he owned, he also disputed the only documents that listed equipment that he owned.  Therefore, there were no documents from which St. Francis County could determine what equipment Jay in fact owned and what his financial condition was.  Based on the Debtors' complete failure to keep and maintain *any records*, the Debtors' discharge must be denied.  Because the Court finds that St. Francis County proved that the Debtors completely failed to keep and maintain *any records* and that this failure prevented the party from ascertaining the debtor's financial condition, the Court does not reach the second part of the analysis under § 727(a)(3) because the burden never shifts to the debtor to prove that the inadequacy is justified under all the circumstances of the case.[20]

---

[20]The Debtors presented Jay's lack of schooling as a defense.  This defense might be relevant were there an issue concerning whether the documents supplied were sufficient for the Creditor to make a reasonable inquiry.  Given the Debtors' failure to keep pertinent records of the information and amounts of money involved, the Court finds this defense to lack merit.

## 2.   Whether Debtors Intended to Hinder, Delay or Defraud

## St. Francis County

In order to prevail on a claim for denial of discharge under § 727, St. Francis County need only prove that one of the § 727(a) exceptions to discharge exists. *In re Moss*, 266 B.R. 408 (8th Cir. BAP 2001).   However, the Court will address, in the alternative, the second provision upon which St. Francis County objects to discharge, which is 11 U.S.C. § 727(a)(2).   Section 727(a)(2) provides the following:

(a) The Court shall grant the debtor a discharge, unless–

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-

(A) property of the debtor, within one year before the date of the filing of the petition;

Under § 727(a)(2)(A), the objecting party must prove by a preponderance of the evidence that: (1) a transfer occurred; (2) debtor transferred his property; (3) the transfer was within one year of the petition, and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee.   *In re Green*, 340 B.R. 93 (Bankr. M.D. Fla 2006) (citing *Williamson Const., Inc. v. Ross (In re Ross)*, 217 B.R. 319, 323 (Bankr. M.D. Fla. 1998).

Because the transfer of the 2002 crop proceeds and the transfer of Jay's

51

equipment to Jerry to sell at the Auction, occurred outside of the one-year statutory period, and thus, fails to meet the third element of the statutory requirements for denial of discharge under § 727(a)(2), the Court will not address these transfers. The remaining transfer of the Track Hoe did occur within the one-year statutory period in § 727(a)(2). The Court finds that the transfer of the Track Hoe meets the elements under § 727(a)(2)(A) as explained below.

As for the first and second elements of the statute, it is clear that a transfer occurred and that the debtor transferred his property in this case.[21] Specifically, Jay purchased the Track Hoe on September 9, 2002, from Riggs Leasing Company. Jay made a down payment on the Track Hoe and continued to make monthly payments on it. He borrowed money from his father to pay off the remaining balance on the Track Hoe, and then transferred the Track Hoe to his father, giving him a Bill of Sale from Double Wright Partnership to Wright Land Company. The Bill of Sale was dated November 11, 2003. Since Jay filed bankruptcy on February 25, 2004, and transferred the Track Hoe on November 11, 2003, within one year of filing, the requirement that the transfer be made within one year, is satisfied.

--------

[21]As stated in the Court's Findings of Fact, there was no evidence that Double Wright Partnership existed as a separate legal entity. Thus, the fact that the Installment Sale Contract for the Track Hoe listed Double Wright Partnership as the Purchaser, is of no consequence.

The remaining element in the statute is whether the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee. In order to determine whether fraud has occurred (because fraud is rarely demonstrated by direct evidence) courts generally look to certain factors, or "badges of fraud," to make the determination of the existence of a fraudulent intent. *In re Mathis*, 258 B.R. 726, 733-34 (Bankr. W.D. Ark. 2000). These badges of fraud that the court studies are whether, (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *Id*. at 734 (citing Ark. Code Ann. § 4-59-204(b)(1)–(11) (1996); *see also Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348 (8th Cir. 1995); *Graven*

*v. Fink*, (*In re Graven*), 936 F.2d 378, 383-84 n. 8 (8th Cir. 1991); *United States v. Johnston*, 245 F.Supp. 433 (W.D. Ark. 1965)).  It is not necessary to find any specific number of these factors to make a finding of fraudulent intent.  *See id*.

The transfer of the Track Hoe exhibited many of the badges of fraud.  First, the transfer was to an insider, in that the transfer was made from son to father.  Second, even after the transfer, Jay retained possession of the Track Hoe, maintained the insurance on it, and used it as a source of income.  Third, Jay did not disclose the transfer of the Track Hoe on his bankruptcy petition and schedules.  Fourth, St. Francis County filed suit against Jay in state court on February 19, 2002, which was before the transfer of the Track Hoe on November 11, 2003.  Fifth, after the transfer of the 2002 crop proceeds, his equipment, and the Track Hoe, Jay was left without assets, except the restaurant and hunting lodge, which he also later transferred.  And finally, Jay was insolvent at the time of the transfer.

The Court finds that based on the evidence, it was clear that Jay was involved in a scheme to defraud St. Francis County.  Specifically, he transferred the Track Hoe with the intent to hinder, delay, and defraud St. Francis County.  Based on the transfer of the Track Hoe, the debtors are also denied their discharge under § 727(a)(2).[22]

---

[22]St. Francis County met its burden of proof with regard to the Track Hoe, and it is only necessary that St. Francis County prove that one transfer was made with the intent to hinder, delay, or defraud its creditors, *see, e.g., In re Moss*, 258

## B.  WHETHER FRAUDULENT TRANSFERS BETWEEN THE DEBTORS AND JERRY AND AUDREY WRIGHT AND WRIGHT LAND COMPANY CAN BE SET ASIDE

In its second *Complaint*, St. Francis County argued that certain fraudulent transfers should be set aside under the Arkansas Fraudulent Transfer Act and 11 U.S.C. § 548 and § 547 of the Bankruptcy Code.  Specifically, St. Francis County requested that the Track Hoe, the proceeds from the Auction of all of Jay's equipment, the 2002 crop proceeds, and the improvements on the land where Shur-A-Shot was located be turned over to the trustee.  However, because St. Francis County has no standing to bring fraudulent transfer claims under § 548 or preferential transfer claims under § 547, the *Complaint*, must be dismissed.

The issue of whether a creditor has standing to bring a claim under the fraudulent transfer provisions of the Bankruptcy Code was recently addressed in *In re Chapman Lumber Co. Inc.,* 343 B.R. 217, 220-221 (Bankr. N.D. Iowa, 2006).  In that case, the court explained in detail as follows:

> The only person explicitly authorized by the Bankruptcy Code to pursue a § 547 preference action is the bankruptcy trustee.  *In re Bargdill*, 238 B.R. 711, 720 (Bankr. N.D. Ohio 1999).  The Eighth Circuit has determined that the statutory language of § 548 expressly confers avoidance powers *exclusively* on the trustee.  *In re Merrifield*, 214 B.R. 362, 365 (8th Cir. BAP 1997) (emphasis in original); *In re Lauer*, 98 F.3d

B.R. 391 (Bankr. W.D. Mo. 2001); therefore, the Court will not address the transfer of the restaurant and hunting lodge.

378, 388 (8th Cir. 1996). Individual creditors of the bankruptcy estate do not have standing to assert claims of voidable transfers. *Lauer*, 98 F.3d at 388; *In re Cassis*, 220 B.R. 979, 983 (Bankr. N.D. Iowa 1998). A trustee's avoidance actions are generally deemed to be non-assignable. *Bargdill*, 238 B.R. at 722; *Preferences and Fraudulent Transfers* 887 PLI/Comm 479, 523 (2006).

Some courts have considered whether a creditor can be granted derivative standing to pursue avoidance claims when the trustee fails to act. *Compare In re Newcorn Enters. Ltd.*, 287 B.R. 744, 748 (Bankr. E.D. Mo. 2002) (finding the Eighth Circuit would allow derivative standing to nontrustees when the trustee does not pursue claims on behalf of the estate); *with In re Bodenstein*, 248 B.R. 808, 817 n. 39 (Bankr. W.D. Ark. 2000) (finding lack of definitive guidance from the Eighth Circuit to import doctrine of derivative standing), *aff'd* 253 B.R. 46 (8th Cir. BAP 2000); *and In re Odom Antennas, Inc.*, 340 F.3d 705, 708 n. 3 [(8th Cir. 2003)] ("We intimate no opinion whether a creditor may pursue a derivative action on behalf of the bankruptcy estate when the trustee declines to pursue such action.") **Even if derivative standing is available, however, a prerequisite to the commencement of an avoidance action by a party other than the trustee is prior permission from the court. 2** *Collier Bankruptcy Manuel* **¶ 548.06 (Henry J. Sommer ed., 3d ed. 2005).**

**A creditor has no right to bring an avoidance action independently. In the absence of a request for permission from the Bankruptcy Court to pursue an avoidance action in the trustee's stead, the practice of allowing derivative standing has no application.** ***See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13 n. 5, 120 S.Ct. 1042, 147 L.Ed.2d 1 (2000).**

*In re Chapman Lumber Co. Inc.,* 343 B.R. at 220-21. (Emphasis added.) The court

in that case ultimately concluded that the creditor had no standing to bring the

fraudulent transfer claims under §§ 544 or 548 or preferential transfer claims under

§ 547; thus, the three Counts in the complaint related to those issues were dismissed

for lack of standing.  *Id.* at 221.

As in *In re Chapman Lumber Co. Inc.,* St. Francis County is an individual creditor of the bankruptcy estate and has no right to bring an avoidance action independently.  Further, even if derivative standing is available, and it is unclear in the Eighth Circuit whether it is or not, St. Francis County did not request permission from this Court to pursue an avoidance action in place of the trustee.  Because St. Francis County lacks standing to pursue fraudulent transfer and preferential transfers claims, this portion of the *Complaint*, must be dismissed.

To the extent that St. Francis County also asserts that the transfers must be set aside under the Arkansas Fraudulent Transfer Act, there is a question of whether the Court has jurisdiction over those claims.  In *In re Chapman Lumber Co. Inc.*, 343 B.R. 217, 221-22 (Bankr. N.D. Iowa, 2006), the Court was faced with a similar situation in that Counts I, II, and III of the Complaint were dismissed because the Bank did not have standing to bring fraudulent transfer claims under §§ 544 or 548 or preferential transfer claims under § 547, leaving the Court to determine whether there was jurisdiction to decide the remaining state law claims in the Bank's Complaint.   In *In re Chapman Lumber Co. Inc.*,  343 B.R. at 221-222, the Court provided the following explanation of "core" and "related to" jurisdiction:

> Bankruptcy courts are authorized to hear "all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11."

28 U.S.C. § 157(b)(1). The bankruptcy judge shall determine whether a proceeding is a "core" proceeding under § 157(b), or whether a proceeding is "related to" a case under Title 11. 28 U.S.C. § 157(b)(3). Bankruptcy courts are not authorized to entertain cases involving noncore, unrelated matters.

In general, a core proceeding is a legal dispute between parties in interest to a bankruptcy case, one of whom is almost always the debtor. Non-core, related proceedings are those which do not invoke a substantive right created by federal bankruptcy law and could exist outside a bankruptcy, although they may be related to a bankruptcy.
*In re Farmland Industries, Inc.,* 296 B.R. 793, 802 (8th Cir. BAP 2003) (citations omitted).

A proceeding is "core" if it invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Barnett v. Stern,* 909 F.2d 973, 981 (7th Cir.1990). For courts to assert jurisdiction over a proceeding "related to" a bankruptcy case, the proceeding must have some effect on the administration of the debtor's estate. *Specialty Mills, Inc. v. Citizens State Bank,* 51 F.3d 770, 774 (8th Cir.1995). Possible effects include any matter that could alter the debtor's rights or liabilities and which in any way impacts upon the handling and administration of the bankruptcy estate. *Integrated Health Servs. v. THCI Co.,* 417 F.3d 953, 958 (8th Cir.2005).

The state law fraudulent transfer claims are clearly a non-core proceeding because they do not invoke a substantive right created by bankruptcy law and could exist outside bankruptcy. Therefore, the Court must determine if there is "related to" jurisdiction. The test for determining whether the Court has "related to" jurisdiction is whether the state law fraudulent transfer claim has any effect on the administration of this bankruptcy estate. First, this is not a derivative action brought on behalf of the

estate; rather, this action was brought by an unsecured creditor on its own behalf.[23]

Second, a study of the docket in this case shows that the panel Chapter 7 Trustee

found this to be a no asset case, meaning there were no funds available for distribution

over and above that exempted by law.[24]  Thus, this case has been fully administered,

there will be no discharged entered, and the case is ready to be closed.  Based on the

foregoing, the Court concludes that the state law fraudulent transfer claims do not

have any effect on the administration of the bankruptcy estate, and the Court does not

have "related to" jurisdiction of the state law claims.

## IV.  CONCLUSION

Based on the Debtors' complete failure to keep or maintain any records as to

the equipment he owned, etc. the Debtors are denied their discharge.  Because St.

Francis County did not have standing to bring a fraudulent transfer action under § 548

or preferential transfer claims under § 547 the Bankruptcy Code, that portion of the

Complaint must be dismissed.  Further, the Court does not have "related to"

---

[23]Polaris is the only secured creditor in this case, and there are three unsecured creditors: Hutcherson Flying Service, Wright Land Company, and St. Francis County.

[24]The Court has no information concerning the Trustee's efforts in this case prior to his decision to declare it a "no asset" case.  Had the panel Chapter 7 Trustee pursued the transfers detailed in this decision, it appears that there would have been funds available for distribution.

jurisdiction over the remaining state law fraudulent transfer claims; therefore that portion of the Complaint must also be dismissed.

In the course of this trial, numerous documents were introduced into evidence upon which different government agencies, such as the Internal Revenue Service and the Farm Services Agency, relied upon in making decisions. Jay and Jerry testified that these documents (which were the basis upon which money was distributed or taxes were assessed) were inaccurate. It appears that Jay and Jerry were either not telling the truth when testifying at trial or were not telling the truth when they signed these important documents (such as the tax returns and CCC502's) and presented them to the proper government entity with the intent of personal monetary gain. It may be that the cause of the conflicting testimony was a series of oversights; however, in every instance the "oversights" inured to the benefit of the Wrights and warrant further investigation. The Court will forward this opinion to the St. Francis County Farm Service Agency, the Arkansas Farm Service Agency, the U.S. Attorney, and the Internal Revenue Service for their use in making further determinations.

It is hereby

**ORDERED** that St. Francis County's *Objection to Discharge* based on § 727(a)(3), and alternatively on § 727(a)(2), is **SUSTAINED**;

**ORDERED** that St. Francis County's *Complaint* to set aside fraudulent

transfers is **DISMISSED**; and

 **ORDERED** that the Court will forward this opinion to the St. Francis County

Farm Service Agency, the Arkansas Farm Service Agency, the U.S. Attorney, and the

Internal Revenue Service.

 **IT IS SO ORDERED.**

        _____
        HONORABLE AUDREY R. EVANS
        UNITED STATES BANKRUPTCY JUDGE

        DATE:  November 13, 2006

cc: A. Jan Thomas, Jr., attorney for the debtors
  Jerry Coleman, attorney for Jerry and Audrey Wright
  Fletcher Long, Jr., attorney for the creditor
  James C. Luker, Chapter 7 Trustee
  U.S. Trustee
  St. Francis County Farm Service Agency
  Arkansas Farm Service Agency
  U.S. Attorney
  Internal Revenue Service